

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

JOHN SCOTT, MICHAEL ANTHONY MEJIA,
SUSAN MEJIA, and GENNESSIS FERNANDEZ,

                      Plaintiffs,

       -against-

THE CITY OF NEW YORK, POLICE OFFICER PETER
EVERETTE SHIELD # 6655 PSA 9, POLICE OFFICER
CAPOLLA PSA 9, LIEUTENANT BRIAN
VANDERSCHUYT PSA 9, POLICE OFFICER SMITH
DORSAINT SHIELD # 12613, POLICE OFFICER JAY
SMITH PSA 9, SERGEANT JOSEPH MULLER, POLICE
OFFICER DARREN ILLARDI ESU UNIT 10, POLICE
OFFICER JASON CARMAN PSA9, POLICE OFFICER
JAMES SOUTHERNTON ESU UNIT 10, SERGEANT
DOMINIC CASALINO ESU UNIT 10, SERGEANT
ELIZABETH MERO SHEILD # 3379, and
UNIDENTIFIED POLICE OFFICERS, all in their capacity
as individuals,

                      Defendants.
-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**16-CV-834 (NGG) (ST)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Plaintiffs assert causes of action under 42 U.S.C. § 1983 and New York common law

against numerous individual police officers (collectively, the "Individual Defendants"). (See

Fourth Am. Compl. ("FAC") (Dkt. 87).) Plaintiffs also name the City of New York (the "City")

as a Defendant in this action. Plaintiffs, however, do not assert an independent Monell claim

against the City; rather, its claims against the City are premised on vicarious liability under

respondeat superior for any common-law torts for which any individual officer is held liable.

(FAC ¶ 40.)

      Plaintiffs' claims arise out of an encounter with Defendants early in the morning of April

2, 2014 that culminated in the arrests of Scott and M. Mejia on charges of obstruction of

1

governmental administration in the second degree in violation of New York Penal Law § 195.05 ("OGA").

Defendants move pursuant to Federal Rule of Civil Procedure 56 for summary judgment on: (1) all Plaintiffs' federal claims for unlawful entry; (2) Scott, M. Mejia, and S. Mejia's federal claims for false arrest; (3) M. Mejia and S. Mejia's federal claims for excessive force; (4) Scott and M. Mejia's federal claims for malicious prosecution; (5) Scott's state-law claim for malicious prosecution; (6) Scott's state-law claim for malicious abuse of process; (7) Scott, M. Mejia, and S. Mejia's federal claims for denial of the right to a fair trial; (8) Fernandez's federal claim for invasion of privacy; and (9) all Plaintiffs' federal and state claims (including Scott's federal excessive force claim, which is otherwise not at issue in this motion) insofar as asserted against Defendants Southerton, Casalino, Carman, and Illardi. (Not. of Mot. ("Mot.") (Dkt. 99); Mem. in Supp. of Mot. ("Mem.") (Dkt. 102).)

For the following reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I.     BACKGROUND

### A.     Statement of Facts

The court bases the following statement of facts on the parties' Local Rule 56.1 Statements and the admissible evidence submitted therewith. (See Defs. R. 56.1 Statement (Dkt. 101); Plfs. R. 56.1 Resp. ("56.1 Resp.") (Dkt. 104); Defs. Reply 56.1 ("56.1 Reply") (Dkt. 107).) The court construes the evidence in the light most favorable to Plaintiffs and draws all reasonable inferences in their favor. See, e.g., Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc., 182 F.3d 157, 160 (2d Cir. 1999) (collecting cases). Where the facts are in dispute, the court credits Plaintiffs' version of events if they are supported by record evidence. Id. However, to the extent

2

that Plaintiffs fail to controvert specific factual statements set forth in Defendants' Local Rule 56.1 Statement with citations to admissible evidence (see, e.g., 56.1 Resp. ¶¶ 10-11, 28), the court credits Defendants' version of events and deems those facts undisputed for the purpose of deciding this motion. See Costello v. N.Y.S. Nurses Ass'n, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011).

Early in the morning on April 2, 2014, the Individual Defendants were each on-duty officers of the New York City Police Department. (56.1 Resp. ¶ 1.) At this time, Plaintiffs were present in Apartment 1A (the "Apartment") located in the building at 1-05 Astoria Blvd., Queens, New York (the "Building"). (Id. ¶¶ 5-7.) Around 1:31 am, the Individual Defendants received a radio run indicating an ongoing family dispute in an apartment located within the Building. (Id. ¶ 2.) Approximately ten minutes later, the Individual Defendants received a second radio run indicating that shots had been fired inside the Apartment. (Id. ¶ 3.) Dorsaint, Smith, Muller, and Everette responded first, arriving at the Apartment around 1:45 am. (Id. ¶ 4.) At some point thereafter, they were joined by Capolla and Vanderschuyt. (Id. ¶ 10.) When the officers arrived, the door to the Apartment was closed but S. Mejia opened the door after Dorsaint knocked. (Id. ¶ 7.) From their vantage point, the Defendants then on the scene were able to see into the Apartment and observed drops of blood on the floor. (Id. ¶¶ 9-11.)

Scott and M. Mejia joined S. Mejia (M. Mejia's mother) by the door. (Id. ¶¶ 12-13.)[1] At some point in their ensuing exchange with the officers, someone began filming the encounter. (See Video (Dkt. 100-10).) Muller asked to enter the apartment to ensure that all occupants were safe, explaining first that the officers were responding to a noise complaint and then, after M. Mejia refused to permit them to enter, that they had received multiple domestic disturbance calls;

---

[1] Also present at the door was Rosanna Fernandez, who was previously named as a plaintiff in this action.

at no point did Muller refer to the shots fired call or the blood on the floor. (56.1 Resp. ¶ 12; Video; Jan. 11, 2017 Tr. of M. Mejia Dep. ("M. Mejia Tr.") (Dkts. 100-6, 103-13) at 27:10-28:17.) Scott, M. Mejia, and S. Mejia verbally refused to permit the officers to enter the Apartment and, over the course of at least the next five minutes, engaged in an at-times heated discussion with Muller about the propriety of the officers' request to enter the Apartment. (56.1 Resp. ¶¶ 13-14; Video.) At several points during their discussion, M. Mejia attempted to defuse the situation by quieting the other Plaintiffs then present. (Video.) M. Mejia does appear somewhat animated in the video but did not raise his voice when speaking to the officers. (Id.) At no time did any of the Plaintiffs physically block or prevent any Individual Defendant from entering the Apartment; indeed, over the course of their discussion, Muller and another officer can be seen advancing into the Apartment without incident. (56.1 Resp. ¶¶ 13-14; Video.) Meanwhile, Fernandez, who at the time was a minor, was in her bedroom with the door closed in a state of partial undress. (56.1 Resp. ¶ 19.)

At this point, the Defendants present entered the apartment. The specific sequence of the events that followed is unclear from the record, but the parties generally agree that, upon entering the Apartment, Everette, Capolla, Muller, and Vanderschuyt arrested Scott. (Id. ¶ 16.) It appears that a considerable amount of force was used to effect this arrest, but Scott's excessive force claim is not at issue in this motion, and so the court will not describe it in detail. Dorsaint arrested M. Mejia by throwing him to the floor, putting handcuffs on him, and placing his foot on his neck. After subduing M. Mejia, Dorsaint pulled out a taser and pointed it at M. Mejia's face while saying "you see this right here motherfucker? This is for you." (Id. ¶¶ 17, 36.) Mero (who by this time had joined the other Individual Defendants) arrested S. Mejia by pulling S. Mejia's hands behind her back, knocking S. Mejia's head against the door, handcuffing S. Mejia,

throwing S. Mejia to the floor, and putting her knee on S. Mejia's back. (Id. ¶¶ 18, 39-40.)
When Mero slammed S. Mejia's head against the door, S. Mejia told Mero that she had brain
injuries due to seizures and asked Mero not to hit her head; likewise, when Mero put her knee on
S. Mejia's back, S. Mejia told Mero that she had back problems and asked her to desist. (May
21, 2018 Tr. of S. Mejia Dep. ("S. Mejia Tr.") (Dkts. 100-8, 103-10) at 54:11-22.) According to
S. Mejia, Mero responded to these pleas with derisive laughter and sarcastically asked S. Mejia
whether she "need[ed] a wheelchair to go to bookings." (Id. at 54:22; see also id. at 54:11-22.)
Mejia was then transported to a marked police vehicle. (Id. at 59:1-15.) She has no memory of
what happened between the time she was thrown on the ground and the time she was placed in
the police vehicle. (Id.)

M. Mejia did not suffer any physical injuries beyond an averred "displeasure" to his neck.
(Id. ¶¶ 37-38.) S. Mejia did not have any visible injuries but told someone present that her head
had been injured, and, at some point while she was in the police car, Vanderschuyt directed other
officers present uncuff her and summon an ambulance. (56.1 Resp. ¶¶ 31, 42-43; Mero
Memobook (Dkt. 103-19) at Bates No. D_004712.) However, when the ambulance arrived, she
refused medical attention. (56.1 Resp. ¶¶ 42-43.)

Upon hearing the commotion, Fernandez put on a pair of shorts and began walking
towards the door of her bedroom. (Aug. 20, 2018 Tr. of G. Fernandez Dep., dated Aug. 20, 2018
("Fernandez Tr.") (Dkt. 100-14) at 30:24-31:11.) As she was reaching for the doorknob, the
door opened from the other side and Muller, Vanderschuyt, and an unidentified male officer
entered. (56.1 Resp. ¶¶ 20-21; Fernandez Tr. at 34:8-24.) At this point, Fernandez had nothing
covering her upper body but was holding a tank-top in her hands, which she raised palms
forward. (Fernandez Tr. at 34:18-35:11.) Fernandez told the officers to leave because she was

not fully dressed. (Id. at 41:12-16.) The officers, however, remained in the room for several minutes; one officer (either Vanderschuyt or the unknown third officer) shined his flashlight around the room. (Id. at 42:23-43:7.) Muller, meanwhile, continually shined his flashlight toward Fernandez's bare breasts and made a face "like if a four-year-old got cotton candy." (Id.) After a few minutes, one of the other officers told Muller that they should leave and let her finish getting dressed. (Id. at 43:11-18.) At no point did the officers ask Fernandez any questions or otherwise speak to her. (56.1 Reply ¶ 6.) Fernandez was not arrested, handcuffed, or otherwise touched by the officers. (56.1 Resp. ¶ 26.)

Southerton responded to the location but did not enter the Building or the Apartment at any time. (Id. ¶ 44.) No Plaintiff saw Casalino (then Southerton's supervisor) at the scene. (Id. ¶¶ 46-47.)

Following these events, Scott and M. Mejia (who were both taken into custody and booked) were prosecuted on charges of OGA and resisting arrest. (Id. ¶ 27; see also M. Mejia Tr. at 45:2-13.) Scott was released on his own recognizance after his initial appearance. (May 1, 2017 Tr. of J. Scott Dep. (Dkts. 100-9, 103-13) at 63:10-11; M. Mejia Tr. at 47:2-7.) Dorsaint signed the criminal complaint against Scott and M. Mejia, which also included sworn testimony from Smith regarding Scott's alleged resistance when Smith tried to arrest him. (56.1 Resp. ¶ 28.) According to the complaint, the officers were responding to a 911 call when they heard screaming from the Apartment (the door to which was partially open when they arrived). (Criminal Compl. (Dkt. 100-9) at 2.) The complaint further alleges that the officers observed blood and could smell bleach in the Apartment, and that both Scott and M. Mejia came to the door and began yelling and screaming while refusing to permit the officers to enter. (Id.) Finally, the complaint alleges that both Scott and M. Mejia writhed and twisted their bodies in an

attempt to evade arrest. (Id.) All charges against Scott and M. Mejia were ultimately dismissed on speedy trial grounds. (56.1 Resp. ¶ 29.)

S. Mejia was summonsed on a charge of disorderly conduct but she was not detained beyond her initial arrest. (Id. ¶¶ 30-31.) S. Mejia did not learn about the summons until some time later when she went to the Queens County Criminal Court and was informed that she was subject to an outstanding bench warrant. (Id. ¶¶ 32-34.) A week or so thereafter, S. Mejia appeared before a judge, who dismissed the case. (Id. ¶ 35.)

### B. Procedural History

Plaintiffs filed their complaint in this court on February 18, 2016. (Compl. (Dkt. 1).) Plaintiffs amended their complaint several times to add and remove defendants before filing the FAC on June 20, 2018. (See FAC.) Discovery proceeded before Magistrate Judge Steven Tiscione and involved considerable motion practice. Discovery closed on November 2, 2018. (See Sept. 14, 2018 Scheduling Order.)

Defendants served notice of the instant motion on February 1, 2019. (See Mot.) Plaintiffs served their opposition on March 1, 2019. (See Mem. in Opp. to Mot. ("Opp.") (Dkt. 105).) Defendants replied on March 22, 2019. (See Reply in Further Support of Mot. ("Reply") (Dkt. 108).)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). "A 'material' fact is one capable of influencing the case's outcome under governing substantive law, and a 'genuine' dispute is one as to which the evidence would permit a reasonable juror to find for the party opposing the motion." Figueroa v. Mazza, 825 F.3d 89, 98

(2d Cir. 2016) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "The movant may discharge this burden by showing that the non-moving party has 'failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co., 255 F. Supp. 3d 443, 451 (S.D.N.Y. 2015) (alteration adopted) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

"To determine whether an issue is genuine, 'the inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion.'" Mikhaylov v. Y & B Trans. Co., No. 15-cv-7109 (DLI), 2019 WL 1492907, at *3 (E.D.N.Y. Mar. 31, 2019) (alterations adopted) (quoting Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995)). Nonetheless, the non-movant "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995) (citation and internal quotation marks omitted).

## III.   DISCUSSION

Defendants move for summary judgment on all but one of Plaintiffs' federal and state claims. The court begins by addressing Plaintiffs' federal claims, each of which is asserted under 42 U.S.C. § 1983, before turning to Plaintiffs' state-law claims.

### A.   Plaintiffs' § 1983 Claims

In order to state a claim under § 1983, a plaintiff must allege (1) that she has been deprived of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that this deprivation occurred under color of law. 42 U.S.C. § 1983; accord Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir. 1994) (citing Parratt v. Taylor, 451 U.S. 527, 535

(1981)).  In this case, Plaintiffs claim that the Individual Defendants, acting under color of law, violated rights secured to them under the Fourth and Fourteenth Amendments by: (1) unlawfully entering their home, arresting them, and prosecuting them without probable cause; (2) using excessive force in effecting their arrests; (3) denying them the right to a fair trial; and (4) invading Fernandez's right to privacy.  The court addresses each of these claims below.

    1.    <u>Unlawful Entry</u>

Scott, M. Mejia, and S. Mejia claim that the Individual Defendants' warrantless entry in to the Apartment violated their rights under the Fourth and Fourteenth Amendments.  Defendants argue that their entry into the Apartment was permissible under the emergency aid exception to the Fourth Amendment's warrant requirement or, in the alternative, that it was objectively reasonable for Defendants to believe that the emergency aid exception applied, thus entitling them to qualified immunity.  (Mem. at 5-10.)  Based on the factual record the court holds that Defendants had, at the least, an arguably reasonable basis to conclude that the emergency aid exception justified their entry and, accordingly, grants Defendants summary judgment on this claim.

The Fourth Amendment protects the rights of people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable."  <u>Brigham City v. Stuart</u>, 547 U.S. 398, 403 (2006) (quoting <u>Groh v. Ramirez</u>, 540 U.S. 551, 559 (2004) (internal quotation marks omitted)).  At the same time, however, "[i]t is well settled . . . that the warrant requirement must yield . . . where exigent circumstances demand that law enforcement agents act without delay."  <u>Callahan v. City of New York</u>, 90 F. Supp. 3d 60, 69 (E.D.N.Y. 2015) (citation omitted).

"One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury." Brigham City, 547 U.S. at 403; see also Kerman v. City of New York, 261 F.3d 229, 235 (2d Cir. 2001) ("[P]olice officers may enter a dwelling without a warrant to render assistance to a person whom they reasonably believe to be in distress." (citation omitted) (alteration adopted)). Whether an officer's belief is reasonable is assessed under an objective standard in light of the totality of the circumstances confronting her at the time she effects entry. See Callahan, 90 F. Supp. 3d at 69; see also Thompson v. Clark, 364 F. Supp. 3d 178, 190 (E.D.N.Y. 2019) (police may enter dwelling without a warrant to render emergency aid "if, based on the totality of the circumstances known to the investigating officers at the time of entry, it was objectively reasonable for them to do so" (citation and internal quotation marks omitted)).

Further, the doctrine of qualified immunity bars § 1983 claims against public officials where either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015) (citing Russo v. City of Bridgeport, 479 F.3d 196, 211 (2d Cir. 2007)); see also Hunter v. Bryant, 502 U.S. 224, 229 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." (citation and internal quotation marks omitted)). "Qualified immunity serves to protect police from liability and suit when they are required to make on-the-spot judgment in tense circumstances." Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998) (citation omitted) (alteration adopted). In the context of a warrantless entry pursuant to the emergency aid exception, qualified immunity bars liability "if, given the circumstances confronting [an] officer, it is at least debatable that he had an objectively

reasonable basis for believing that an individual inside a home needed medical assistance." Batt v. Buccilli, 725 F. App'x 23, 26 (2d Cir. 2018) (summary order) (citation and internal quotation marks omitted).

In this case, Defendants were responding to a 911 call indicating that shots had been fired in the Apartment and, upon their arrival, saw blood on the floor of the Apartment. (56.1 Resp. ¶¶ 3-11.) If the 911 call were the only fact of which Defendants were aware, the question of whether their entry was justified might present a close call. See Kerman, 261 F. 3d at 235-36 (single anonymous 911 call from location other than that from which call was placed insufficient to justify warrantless entry); but see Tierney v. Davidson, 133 F.3d 189, 197 (2d Cir. 1998) (emergency aid exception applied where officers were responding to report of domestic dispute). The presence of blood in the Apartment, however, distinguishes this case from existing precedent. While the court is not aware of any prior case involving similar facts to those present here, it concludes on this record that the presence of blood at the Apartment coupled with the shots fired calls provided Defendants at least an arguably reasonable basis to believe that there existed a need to render emergency aid to someone inside the Apartment at the time Defendants effected entry. As such, Defendants are entitled to qualified immunity.

Accordingly, the court grants summary judgment to Defendants on Plaintiffs' unlawful entry claims.

### 2. False Arrest

Defendants argue that Scott, M. Mejia, and S. Mejia's claims for false arrest necessarily fail because the undisputed factual record establishes that actual or arguable probable cause

existed to arrest each for OGA.[2] (See Mem. at 10-13.) The court disagrees and denies Defendants' motion as to these claims.

"A § 1983 claim for false arrest . . . is substantially the same as a claim for false arrest under New York law." Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996). The state standard for false arrest requires "that: '(1) the defendants intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Sethi v. Nassau Cty., No. 11-cv-6380 (SJF), 2014 WL 2526620, at *3 (E.D.N.Y. June 3, 2014) (alterations adopted) (quoting Jocks v. Tavernier, 316 F.3d 128, 134-35 (2d Cir. 2003)). Such "privileged" confinement arises if probable cause to arrest exists, i.e., if the arresting officer has sufficient knowledge or information "to warrant a person of reasonable caution in the belief that the person to be arrested has committed a crime." See Stansbury v. Wertman, 721 F.3d 84, 89 (2d Cir. 2013). In that case, a false arrest claim cannot succeed. See Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007) ("The existence of probable cause to arrest . . . is a complete defense to an action for false arrest.") (internal quotation marks and citations omitted).

Further, an arresting officer may claim qualified immunity on a claim of damages for false arrest even in the absence of probable cause, "if he can establish that there was 'arguable probable cause' to arrest." Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." Id. (internal quotation marks and citations omitted).

---

[2] While S. Mejia was not charged with OGA, this does not preclude summary judgment for Defendants if the court concludes that probable cause existed to arrest her for that offense. See, e.g., Berg v. Kelly, 897 F.3d 99, 110-11 (2d Cir. 2018) ("[O]fficers who ha[ve] objective probable cause to arrest individuals for any crime . . . [are] not subject to damages for false arrest under § 1983.").

12

To satisfy the elements of OGA "an individual must prevent or attempt to prevent a public official from performing a lawful official function by interfering with that function." Kass v. City of New York, 864 F.3d 200, 209 (2d Cir. 2017); see N.Y. Penal Law § 195.05. Such interference "must be . . . physical"; mere yelling is insufficient. Basinski v. City of New York, 706 F. App'x 693, 697 (2d Cir. 2017) (summary order); see also Matter of Davan L., 91 N.E.2d 909, 910 (N.Y. 1997) ("[P]urely verbal interference may not satisfy the 'physical' component under Penal Law § 195.05."). This requirement "is satisfied when an individual intrudes himself into, or gets in the way of, an ongoing police activity." Kass, 864 F.3d at 210 (internal quotation marks and citations omitted) (alterations adopted).

In this case, it is undisputed that all three Plaintiffs asserting false arrest claims argued with the Individual Defendants over whether they had the right to enter the Apartment. (56.1 Resp. ¶¶ 13-14.) While Defendants contend that Scott, M. Mejia, and S. Mejia also "stood in the doorway . . . leaving no path for [the Individual Defendants] to enter without coming into physical contact with [P]laintiffs" (Mem. at 12), that fact is, at best, in dispute. Dorsaint testified at his deposition that either Scott or M. Mejia was pushing him back to prevent him from entering the Apartment. (Aug. 7, 2017 Tr. of S. Dorsaint Dep. (Dkt. 100-4) at 38:14-23.) His account, however, is directly contradicted by Smith, who testified that Scott and M. Mejia were not blocking him or anyone else from entering the Apartment, and that he did not observe either Plaintiff pushing anyone. (56.1 Resp. ¶¶ 13-14.) Capolla also testified that he was able to enter the Apartment unimpeded. (Id. ¶ 13.) Moreover, over the course of the video recording of the encounter, Muller and another officer take several steps into the Apartment, apparently unimpeded. (See Video.)

As such, viewing the summary judgment record in the light most favorable to Plaintiffs,

there exists a genuine dispute of material fact over whether Scott, M. Mejia, and S. Mejia

physically interfered with Defendants' entry and, thus, whether actual or arguable probable cause

existed to arrest them. Accordingly, Defendants are not entitled to summary judgment on Scott,

M. Mejia, and S. Mejia's false arrest claims. See Greene v. City of New York, No. 15-cv-6436

(NGG), 2019 WL 3606739, at *10 (E.D.N.Y. Aug. 6, 2019) (summary judgment inappropriate

where evidence did not indicate that plaintiffs had physically interfered with police officers

engaged in performance of lawful function); Fana v. City of New York, No. 15-cv-8114 (PGG),

2018 WL 1581680, at *9-10 (S.D.N.Y. Mar. 27, 2018) (same) (collecting cases).

### 3. Malicious Prosecution

Scott and M. Mejia both assert federal claims for malicious prosecution.[3] "The elements

of a malicious prosecution claim under section 1983 are derived from applicable state law."

Swartz v. Insogna, 704 F.3d 105, 111 (2d Cir. 2013). These elements are: "(1) commencement

of a criminal proceeding, (2) favorable termination of the proceeding, (3) lack of probable cause,

and (4) institution of the proceedings with actual malice." Id. at 111-12. However, while New

York employs a more lenient standard, the "favorable termination" element of a § 1983

malicious prosecution claim is satisfied only by a disposition consistent with that required at

common law, i.e., one that "affirmatively indicate[s] the innocence of the accused." Lanning v.

City of Glens Falls, 908 F.3d 19, 27 (2d Cir. 2018) (citing Restatement (Second) of Torts § 660

cmt. a (Am. Law Inst. 1977)).

The cases against Scott and M. Mejia were both dismissed on speedy trial grounds. (See

56.1 Resp. ¶ 29.) Defendants argue that, because a speedy trial dismissal is silent as to guilt or

---

[3] Scott and M. Mejia also assert state-law claims for malicious prosecution, which the court addresses separately.
See infra Part III.B.1.

innocence, Plaintiffs cannot prevail on the "favorable termination" element under the rule announced in <u>Lanning</u> and their malicious prosecution claims fail. (Mem. at 13-15.)

While it is true that a speedy trial dismissal is, on its face, silent as to guilt or innocence, Defendants misunderstand the scope of <u>Lanning</u>. As Judge Chen recently observed in <u>Blount v. City of New York</u>:

> Distilled to its essence, <u>Lanning</u> holds that New York state tort law does not define or limit the scope of liability under § 1983 for malicious prosecution, except to the extent that New York law reflects the traditional common law. 908 F.3d at 26. In reaffirming that its prior decisions in malicious prosecution cases requiring affirmative indications of innocence—rather than New York state cases that only require dismissal to be "consistent" with innocence—continue to govern § 1983 claims, the Second Circuit explicitly approved of its decision in <u>Singleton v. City of New York</u>, 632 F.2d 185 (2d Cir. 1980). <u>Lanning</u>, 908 F.3d at 25–26 ("Thus, in [<u>Singleton</u>], our seminal decision on § 1983 malicious prosecution claims, we did not mechanically apply the law of New York State."). That decision "'adopted and applied' the traditional common law of malicious prosecution to the parallel federal constitutional claim brought under § 1983." <u>Id.</u> (quoting <u>Singleton</u>, 632 F.3d at 195). As <u>Lanning</u> makes clear, "the dismissal of a prosecution on speedy trial grounds is a favorable termination" under the traditional common law. <u>Id.</u> at 27 n.6 (citing Restatement (Second) of Torts § 660 cmt. d (Am. Law Inst. 1977)).

No. 15-cv-5599 (PKC), 2019 WL 1050994, at *4 (E.D.N.Y. Mar. 5, 2019). <u>But see</u> <u>Jamison v. Cavada</u>, No. 17-cv-1764 (LTS), 2019 WL 6619328, at * 5 (S.D.N.Y. Dec. 5, 2019) (granting summary judgment on malicious prosecution claim because "[t]he dismissal of Plaintiff's charges on speedy trial grounds does not affirmatively indicate his innocence, as required under Section 1983"); <u>Thompson v. City of New York</u>, No. 17-cv-3064 (DLC), 2019 WL 162662, at *4 (S.D.N.Y. Jan. 10, 2019) (same). "This alone is sufficient to defeat Defendants' motion." <u>Blount</u>, 2019 WL 1050994, at *4.

Scott and M. Mejia may thus proceed with their § 1983 malicious prosecution claims; they cannot, however, assert these claims against all Individual Defendants. While neither party

addresses this issue, Defendants' 56.1 Statement asserts that only Dorsaint and Smith provided statements to the District Attorney's Office in connection with the arrests of Scott and M. Mejia, and Plaintiffs do not refute this claim. (See 56.1 Resp. ¶ 28.) As such, the undisputed facts indicate that no other Defendant "commenced" proceedings against Scott or M. Mejia, as required to sustain a malicious prosecution claim. See, e.g., Rodriguez v. City of New York, 291 F. Supp. 3d 396, 414 (S.D.N.Y. 2018) (granting summary judgment on malicious prosecution claim against one defendant because "there is nothing in the record to show that [said defendant] processed Plaintiff's arrest paperwork or had any interaction with the [District Attorney's Office]").

Accordingly, the court denies summary judgment to Defendants Dorsaint and Smith and grants summary judgment to the remaining Defendants.

### 4. Excessive Force

While Defendants have not moved to dismiss Scott's excessive force claim, they contend that M. Mejia and S. Mejia's claims fail as a matter of law because Defendants used only de minimis force to effect their arrests. (Mem. at 21-22.) Defendants further assert that M. Mejia's claim fails because he suffered no injury beyond "displeasure" to his neck. (Id. at 22.) Finally, Defendants argue that the undisputed factual record indicates that only Dorsaint (who arrested M. Mejia) and Mero (who arrested S. Mejia) used any force against either of the Mejias, necessitating dismissal of their excessive force claims to the extent either purports to assert them against any Defendant other Dorsaint and Mero.

"[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395

(1989) (emphasis omitted). When evaluating an excessive force claim, courts in this Circuit "consider the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Terebesi v. Torreso, 764 F.3d 217, 231 (2d Cir. 2014) (citation and quotation marks omitted). The reasonableness determination is an objective one that must be made with reference to the perspective of a reasonable officer at the scene; in other words, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham, 490 U.S. at 396 (citation and internal quotation marks omitted). At the same time, however, "in some circumstances, no use of force is reasonable because none is required." Esperanza v. City of New York, 325 F. Supp. 3d 288, 303 (E.D.N.Y. 2018) (citation omitted).

Because it is so fact-intensive, this reasonableness inquiry is typically inappropriate for resolution on summary judgment. See Duryea v. Cty. of Livingston, No. 06-cv-6436, 2012 WL 162407, at *4 (W.D.N.Y. Jan. 19, 2012) (whether force used was reasonable "is a fact intensive inquiry, and is best left for a jury to decide" (citing Landy v. Irizzary, 884 F. Supp. 788, 797 (S.D.N.Y. 1995)). "Nevertheless, summary judgment in an excessive force case is not precluded if the evidence, viewed in a light most favorable to the plaintiff, would support a directed verdict for the defendants." Landy, 884 F. Supp. at 798.

The court agrees with Defendants that there is no evidence that any Individual Defendant other than Dorsaint and Mero used any force on either M. Mejia or S. Mejia and grants summary judgment to all Defendants other than Dorsaint and Mero. The court further grants summary judgment to Dorsaint as to the claim brought by S. Mejia, and to Mero as to the claim brought by

M. Mejia, as neither Mejia has introduced evidence indicating that either was subject to the use of force by any non-arresting Defendant.

The court further agrees with Defendants that there is no evidence indicating that M. Mejia suffered anything more than, at most, <u>de minimis</u> injury, defeating his claim as a matter of law. Accordingly, the court grants summary judgment to Dorsaint on M. Mejia's excessive force claim. <u>See</u> <u>Greene</u>, 2019 WL 3606739, at *12-13 (dismissing excessive force claims where evidence did not indicate that plaintiffs suffered anything greater than <u>de minimis</u> injury); <u>see also</u> <u>Romano v. Howarth</u>, 998 F.2d 101, 105 (2d Cir. 1993) ("[A] <u>de minimis</u> use of force will rarely suffice to state a constitutional claim.").

The court, however, is unpersuaded by Defendants' argument Mero's actions in forcibly pulling S. Mejia's hands behind her back, knocking S. Mejia's head against the door, throwing S. Mejia to the floor, and putting her knee on S. Mejia's back are insufficient to sustain an excessive force claim as a matter of law. As discussed above, whether a given instance of the use of force is "excessive" depends heavily on the circumstances and, indeed, in some circumstances, <u>any</u> use of force qualifies as excessive. <u>See</u> <u>Esperanza</u>, 325 F. Supp. 3d at 303. Though Defendants correctly observe that courts have granted motions to dismiss or for summary judgment on excessive force claims in the face of objectively equal or, in some cases, more coercive uses of force than that at issue here (Mem. at 21-22), they elide the fact that the use of force in those cases was necessarily evaluated with reference to the circumstances that prompted it. <u>See, e.g.,</u> <u>Cunningham v. Rodriguez</u>, 01-cv-1123 (DC), 2002 WL 31654960, at *5-6 (S.D.N.Y. Nov. 22, 2002) (court officer did not use excessive force when wrestling and throwing to the ground plaintiff, a pretrial detainee, after plaintiff began screaming obscenities at court and refused to cease when ordered to do so).

In this case, the record indicates that Mero's use of force on S. Mejia was essentially unprovoked. While S. Mejia was among those objecting to Muller and the other Defendants' demand to enter the Apartment, this alone does not suffice to justify Mero's decision to use force against Ms. Mejia. See Jackson v. Tellado, 236 F. Supp. 3d 636, 667-68 (E.D.N.Y. 2017) ("[I]t is clearly established that verbal objections to police actions do not warrant use of physical force." (collecting cases)); see also Meredith v. Erath, 342 F.3d 1057, 1061 (9th Cir. 2003) (affirming district court's denial of summary judgment on excessive force claim where, in response to plaintiff's verbal request to see a search warrant, defendant "grabbed her by her arms, forcibly threw her to the ground and, twisting her arms, handcuffed her"). Moreover, even assuming that S. Mejia were, in fact, blocking the door—a matter that the court cannot resolve on this record— the court would likely reach the same conclusion, given the absence of evidence indicating that Mejia was resisting or otherwise presented such a danger that it was necessary for Mero to use the force that she did by, e.g., throwing Mejia to the ground after she had already been handcuffed. See, e.g., Adedeji v. Holder, 935 F. Supp. 2d 557, 568-69 (E.D.N.Y. 2013) (holding that "even a minor use of force" is unreasonable when used on compliant arrestee who has already been handcuffed (collecting cases)).

Accordingly, the court denies summary judgment to Mero as to S. Mejia's excessive force claim, grants summary judgment to Mero as to M. Mejia's excessive force claim, and grants summary judgment to the remaining Defendants as to both M. Mejia and S. Mejia's excessive force claims.

### 5.    Denial of the Right to a Fair Trial

Scott, M. Mejia, and S. Mejia also assert claims for denial of the right to a fair trial in violation of their Fourteenth Amendment due-process right. Where, as here, such claims are

19

based on the alleged falsification of evidence, each must prove that: (1) a defendant, (2) fabricated evidence, (3) that was likely to influence a jury's decision, (4) forwarded that information to prosecutors, and (5) thereby caused him or her to suffer a deprivation of liberty. See Garnett v. Undercover Officer C0039, 838 F.3d 265, 279-80 (2d Cir. 2016).

As to Scott and M. Mejia's claims, Defendants argue that summary judgment should be granted to all Defendants except Smith and Dorsaint because there is no evidence that any other Defendant forwarded any information to prosecutors and, further, that summary judgment should be granted to Smith and Dorsaint because the criminal complaint and supporting deposition they provided was, in all material respects, true. (Mem. at 17-20.) Defendants further contend that summary judgment is appropriate on S. Mejia's claim because: (1) there is no evidence that any Individual Defendant forwarded any information regarding S. Mejia to prosecutors at all; and (2) in any event, the single court appearance that Ms. Mejia was required to make does not amount to a "deprivation of liberty" as a matter of law. (Id. at 19-20.)

As an initial matter, because there is no evidence that any Defendant other than Smith and Dorsaint provided information to the District Attorney's Office in connection with the charges against Scott and M. Mejia, the court grants summary judgment to all Defendants except Smith and Dorsaint on Scott and M. Mejia's fair-trial claims.

The court further agrees with Defendants that S. Mejia's claim fails as a matter of law. S. Mejia has not provided (nor is the court aware of) any precedential support for the assertion that a single court appearance represents a cognizable deprivation of liberty within the meaning of a fair-trial claim. "Although courts in this Circuit have found that attending multiple court appearances may constitute a sufficient deprivation of liberty, the [P]laintiff, and this [c]ourt, have identified no case in which a single court appearance sufficed" to make out a fair-trial

claim. <u>Randolph v. Metro. Transp. Auth.</u>, No. 17-cv-1433 (DLC), 2018 WL 2943744, at *7

(S.D.N.Y. June 12, 2018) (citing, <u>inter alia</u>, <u>Baksh v. City of New York</u>, No. 15-cv-7065 (NGG),

2018 WL 1701940, at *10 (E.D.N.Y. Mar. 31, 2018) ("Plaintiff's initial detention combined with

his subsequent court appearances and community service, clearly constitutes a deprivation of

liberty supporting a fair-trial claim.")). S. Mejia argues that she suffered a deprivation of liberty

when she was "subjected to excessive force, placed in handcuffs, [and] taken out of her

apartment." (Opp. at 22.) Though these are certainly deprivations of liberty in the literal sense,

they are of the sort appropriately redressed through other claims that she is already asserting, <u>i.e.</u>

excessive force and false arrest. Accordingly, the court grants summary judgment to all

Defendants on S. Mejia's claim.

Scott and M. Mejia's fair-trial claims against Smith and Dorsaint, however, are not

amenable to summary adjudication. While Defendants argue that summary judgment is

appropriate because the information Smith and Dorsaint provided was "true in all material

respects" (Mem. at 19), there are meaningful discrepancies between the facts set forth in the

criminal complaint against Scott and M. Mejia, Plaintiffs' own account of what transpired, and,

indeed, some of Smith's own deposition testimony. <u>See</u> <u>supra</u> Part III.A.2. As Plaintiffs

correctly argue, Defendants' argument essentially boils down to an assertion that they are telling

the truth and Plaintiffs are not. (<u>See</u> Opp. at 21.) That may well be the case, but it is a matter for

a jury to resolve, not this court.

    6. <u>Violation of the Right to Privacy</u>

Gennessis Fernandez asserts a claim for violation of her Fourteenth Amendment right to

privacy premised on the search of her room by Muller, Vanderschuyt, and an unidentified third

officer while she was partially undressed. Defendants contend that: (1) Fernandez's claim cannot

stand against the third officer because she has not identified him; and (2) Fernandez's claim against Muller and Vanderschuyt fails because "it was reasonable for them to enter the plaintiff's bedroom" to ensure her safety and to require her to remain in the nude while they did so. (Mem. at 24.) Defendants argue in the alternative that they are entitled to qualified immunity. (Id. at 25.) Plaintiffs do not respond to Defendants' argument concerning the unnamed officer and, accordingly, the court deems the claim against him abandoned. See Greene, 2019 WL 3606739, at *5 (treating as abandoned and therefore dismissing claims not addressed in plaintiffs' opposition to motion for summary judgment (citing Jackson v. Federal Exp., 766 F.3d 189, 196 (2d Cir. 2014)).

It cannot be gainsaid that the Constitution protects the individual right to privacy, including "a right to privacy in one's unclothed body in the context of search and seizure by the government." Gonzalez v. City of New York, No. 01-cv-5584 (JG), 2006 WL 8435010, at *16 (E.D.N.Y. Jan. 3, 2006) (quoting Poe v. Leonard, 282 F.3d 123, 136 (2d Cir. 2002) (alterations adopted)); see also, e.g., Daniels v. City of New York, No. 16-cv-190 (PKC), 2018 WL 4119191, at *8-9 (E.D.N.Y. Aug. 29, 2018) (holding that right to privacy in one's unclothed body is clearly established and denying qualified immunity where officers made plaintiff stand in the nude for several hours). This right, however, is not unlimited, and police may require civilians to stand in the nude when doing so is necessary to advance a legitimate law enforcement interest. See Los Angeles Cty. v. Rettele, 550 U.S. 609, 614 (2007) (where appellees were nude in bed when officers entered to execute search warrant, officers did not violate appellees' constitutional rights by requiring them to briefly stand nude while officers searched bed for weapons and secured room). Whether a law enforcement action that exposes an individual's unclothed body violates her right to privacy is judged by a standard of objective reasonableness. Id. Nonetheless, "a

police officer violates a person's right to bodily privacy when that officer manipulates the circumstances to view . . . that person's unclothed or partially unclothed body." Poe, 282 F.3d at 139.

In this case, Fernandez asserts that Muller, Vanderschuyt, and a third officer entered her room and remained there for several minutes while Fernandez was topless and, even though she had a shirt in her hand, did not ask, tell, or permit her to put it on. While in her room, none of the officers said anything Fernandez, nor did any of the officers physically search the room, although one of the officers (not Muller) did shine his flashlight around. Muller, meanwhile, shined his flashlight toward Fernandez's bare breasts and made a face indicating some sort of gratification.

Although Rettele established that officers may, in some circumstances, force individuals to stand in the nude for a few minutes without giving rise to a constitutional claim, that decision was based, in part, on the lack of any "allegation that the deputies prevented Sadler and Rettele from dressing longer than necessary to protect [the deputies'] safety." 550 U.S. at 615. However, there is no indication from the record that the officers believed at any point that Fernandez posed any threat to the officers' safety. Indeed, on reply, Defendants argue that the officers' objective was to ensure that Fernandez herself was safe and the room was secure. (Reply at 9.) This being the case, there is no discernible reason why Fernandez had to remain nude for several minutes or why she could not put on the shirt in her hand after she had expressed that she was uncomfortable with the officers being present while she was not fully dressed. Nonetheless, the court has been unable to locate any authority, binding or persuasive, finding a constitutional violation where officers require an individual to stand nude for only a brief period of time in a location where the officers were actually conducting a lawful search.

Therefore, the court concludes that Vanderschuyt—whom Fernandez does not claim looked directly at her at any point—is, at the very least, entitled to qualified immunity.

Accepting Fernandez's versions of events as true, however, Muller is entitled neither to summary judgment nor qualified immunity. Fernandez (whose retelling of events is, on this record, essentially undisputed) recounted that while the other officers were shining a flashlight around the room, Muller was shining his flashlight towards, and staring at, her bare breasts. The court is not prepared to deem these actions reasonable as a matter of law, as it is unclear what, if any, law enforcement objective could possibly be advanced by gawking at a topless sixteen-year-old for any amount of time. Moreover, as Defendants themselves recognize, it is clearly established that an individual's right to bodily privacy is violated when an officer "manipulates the circumstances" to view her unclothed body (Mem. at 23 (quoting Poe, 282 F.3d at 139)) and Muller, in specifically and intentionally shining his flashlight towards Fernandez's breasts for several minutes, is alleged to have done precisely that.

Accordingly, the court denies summary judgment to Muller and grants it to the remaining Defendants.

## B. Scott's State-Law Claims

Scott also asserts common-law claims for malicious prosecution and malicious abuse of process under New York law. The court addresses these claims below.

### 1. Malicious Prosecution

While Defendants purport to move for summary judgment on "all of [P]laintiffs' claims, except [P]laintiff John Scott's claim for excessive force" (Mot. at 2), their briefing does not address Scott's state-law malicious prosecution claim. Based on its review of the summary judgment record and the parties' arguments concerning Scott's federal malicious prosecution

claim, however, the court denies summary judgment to Smith, Dorsaint, and the City insofar as it is vicariously liable respondeat superior,[4] and grants it to the remaining Defendants.

As discussed supra in Part III.A.3, the elements of a malicious prosecution claim under New York law comprise: "(1) commencement of a criminal proceeding, (2) favorable termination of the proceeding, (3) lack of probable cause, and (4) institution of the proceedings with actual malice." Swartz, 704 F.3d at 111-12. The only meaningful difference between the federal and New York standards is that the favorable termination prong is more lenient under state law and requires establishing only a final termination that is "not inconsistent with the innocence of the accused." Cantalino v. Danner, 754 N.E.2d 164, 167 (N.Y. 2001) (emphasis added).

Because the court has already determined that Scott's claim may proceed under the more stringent federal standard, he may also move forward with his corresponding state-law claim. However, as with the federal claim, Plaintiffs have not presented any evidence that any Individual Defendant other than Smith and Dorsaint "commenced" proceedings against Scott. He may, therefore, only assert this claim against these Defendants and, derivatively, against the City.

Accordingly, the court denies summary judgment to Dorsaint, Smith, and the City, and grants summary judgment to the remaining Defendants.

2.    Malicious Abuse of Process

To prevail on his claim for malicious abuse of process, Scott must establish that the Individual Defendants: (1) used a regularly issued legal process, (2) with the intent to do harm without excuse or justification, (3) in order to obtain a collateral objective outside the legitimate

---

[4] See Rosario v. City of New York, No. 18-cv-4023 (LGS), 2019 WL 4450685, at *8 (S.D.N.Y. Sept. 16, 2019) (where underlying state-law malicious prosecution claim is valid, plaintiff may proceed against City on respondeat superior theory).

ends of the process. See, e.g., DeMartino v. N.Y.S. Dep't of Labor, 167 F. Supp. 3d 342, 372 (E.D.N.Y. 2016). To establish a "collateral objective" sufficient to sustain his abuse of process claim, Scott must prove that the Individual Defendants acted not merely with an improper motive, but to achieve an improper purpose; in other words, Scott must establish that they "aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." Savino v. City of New York, 331 F.3d 63, 77 (2d Cir. 2003). "Moreover, the pursuit of a collateral objective must occur after the process is issued; the mere act of issuing process does not give rise to a claim." Fiedler v. Incandela, 222 F. Supp. 3d 141, 164 (E.D.N.Y. 2016) (quoting Lopez v. City of New York, 901 F. Supp. 684, 691 (S.D.N.Y. 1995) (internal quotation marks omitted) (alteration adopted)).

In this case, the summary judgment record is devoid of any evidence to support the "collateral objective" prong of Scott's abuse of process claim. Scott asserts that the Individual Defendants pursued charges against him "to justify the significant beating they inflicted on John Scott." (Opp. at 20.) This, however, amounts to an improper motive in instituting charges, not a collateral purpose as required to sustain an abuse of process claim. See Savino, 331 F.3d at 68, 77-78 (affirming grant of summary judgment on abuse of process claim premised on prosecution of former city employee "as retaliation for . . . embarrassing media" as such constituted only improper motive); cf. Corley v. Vance, 365 F. Supp. 3d 407, 443-44 (S.D.N.Y. 2019) (allegation that plaintiff was arrested "to compel his cooperation in Nuisance Abatement Proceedings" stated abuse of process claim).

Moreover, even assuming that the attempt to justify the force inflicted on Scott did qualify as a collateral objective, there is no evidence indicating that any Individual Defendant

took action to pursue that objective <u>after</u> the criminal complaint against Scott was issued. On this basis as well, Defendants are entitled to summary judgment.

Accordingly, the court grants summary judgment to all Defendants on Scott's abuse of process claim.

### C.      Specific Defendants

Defendants argue that all claims, including Scott's excessive force claim, must be dismissed as against Southerton, Casalino, Carman, and Illardi for lack of personal involvement. (Mem. at 25.) Plaintiffs do not respond to Defendants' arguments concerning Southerton and Casalino. As such, the court deems those claims abandoned, grants summary judgment to Southerton and Casalino, and dismisses them from this case. <u>See</u> <u>supra</u> Part III.A.6.

The court agrees with Plaintiffs, however, that summary judgment is not appropriate as to Carman and Illardi because there remains a dispute of fact about whether either or both used pepper spray on Scott. While an incident report generated by Tarantola states that both Carman and Illardi had used their pepper spray on Scott, Defendants argue that this report was based on erroneous information provided by Vanderschuyt. (Reply at 9-10) However, at his deposition, Vanderschuyt did not affirmatively state that this information had been included in error; instead, when asked whether Illardi and Carman had used pepper spray, he answered that he was "not exactly sure who did the pepper spray. It could be [Carman and Illardi]. It could not be." (Aug. 22, 2018 Tr. of Dep. of Brian Vanderschuyt (Dkt. 106-2) at 13:20-21; <u>see also</u> <u>id.</u> at 13:8-13.) Likewise, Defendants argue that it is undisputed that it was Coppola who used his pepper spray; while this may be true, it is not clear from the record that only one officer used pepper spray. As such, the court cannot conclude that either Carman or Illardi is entitled to judgment as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED IN PART and DENIED IN PART. Summary judgment on all claims, including John Scott's excessive force claim, is GRANTED to James Southerton and Dominic Casalino.

As to the remaining Defendants, in addition to John Scott's excessive force claim against the remaining Individual Defendants, which was otherwise not at issue on this motion, summary judgment is DENIED as to the following claims:

1) John Scott, Michael Mejia, and Susan Mejia's false arrest claims against the remaining Individual Defendants;
2) John Scott and Michael Mejia's federal malicious prosecution claims against Jay Smith and Smith Dorsaint;
3) John Scott's state-law malicious prosecution claim against Jay Smith, Smith Dorsaint, and the City of New York;
4) Susan Mejia's excessive force claim against Elizabeth Mero;
5) John Scott and Michael Mejia's fair-trial claim against Jay Smith and Smith Dorsaint; and
6) Gennessis Fernandez's claim for invasion of privacy against Joseph Muller.

Summary judgment is otherwise GRANTED.

The Clerk of Court is respectfully DIRECTED to terminate Defendants James Southerton and Dominic Casalino.

The parties shall submit their joint pre-trial order by no later than 12:00 pm on January 21, 2020, and shall contact the court's Deputy at (718) 613-2545 to schedule a pretrial conference. The parties shall file their motions in limine by no later than 3:00 pm on Friday, January 24, 2020.

SO ORDERED.

Dated: Brooklyn, New York
       January 14, 2020

s/Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge

28